UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

MARK WHALEN and
JAKE WHALEN,

        Plaintiffs,                         Case No: 24-cv-342

v.

TYLER SELK,

        Defendant.

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Mark and Jake Whalen, by their attorneys GINGRAS, THOMSEN & WACHS, LLP, hereby submit the following Brief in Opposition to Defendant's Motion for Summary Judgment.

I.      INTRODUCTION.

Tyler Selk has moved for summary judgment on Mark Whalen's and Jake Whalen's First Amendment retaliation claims. Selk has filed this motion despite publicly calling for the elimination of "toxins" from the Waunakee boys' basketball program. He has filed this motion despite admitting that Mark Whalen was one of those toxins, and despite cutting senior Jake Whalen from the team shortly after making the "toxins" statement, thus eliminating Mark and Jake from the team. Selk further admitted that he considered Mark Whalen to be a toxin because of complaints Mark made about him. Also, Selk admitted that Jake Whalen's complaint (Jake complained that he felt he was the victim of unfair treatment because of things his father had said) was the primary reason he cut Jake.

There are beyond doubt issues of material fact to be decided by a jury. For those reasons, the motion for summary judgment should be denied.

II.     STATEMENT OF FACTS.[1]

For many years, Tyler Selk served as an assistant coach for the Waunakee Area School District Boys' High School Varsity Boys' Basketball team. PPFOF ¶ 8. He was an assistant coach for the 2022-2023 season. PPFOF ¶ 9.

Selk's entire time as an assistant coach was served under head coach Dana MacKenzie. PPFOF ¶ 8. Dana MacKenzie was the head coach during the 2022-2023 season. MacKenzie and Selk considered each other to be very close friends. PPFOF ¶ 10. Together, they ran a business called "Waunakee Basketball." PPFOF ¶ 236. Waunakee Basketball was a private venture from which both MacKenzie and Selk profited personally. PPFOF ¶ 236.

Waunakee Hoops Club oversees basketball in the Waunakee community. PPFOF ¶ 15. It is a non-profit organization unaffiliated with Waunakee Basketball. PPFOF ¶ 14.

During the 2022-2023 school year, Jake Whalen was a junior at Waunakee High School. PPFOF ¶ 20. He played for the boys basketball team as a freshman on the freshman team, and he played on the junior varsity team as a sophomore. PPFOF ¶ 20. During his junior year, Jake played on the varsity team. PPFOF ¶ 20. He began his junior year in the rotation (meaning that he was among a group of players who routinely received playing time.) but as the year progressed, he dropped out of the rotation. PPFOF ¶ 65.

Mark Whalen is Jake's father. PPFOF ¶ 21.

---

[1] The plaintiffs refer the court to their Proposed Findings of Fact and their Response to the Defendant's Proposed Findings of Fact for the authoritative statement of facts in this case.

Beginning in the spring of 2022, a group of parents of Waunakee basketball players began to speak out about MacKenzie as head coach. PPFOF ¶ 28 By fall or early winter of that year, Mark had emerged as the group's leader. PPFOF ¶ 85.

Complaints about both MacKenzie and Selk were varied, but three concerns take center stage in this case. Whalen complained that MacKenzie and Selk were committing fraud. Specifically, he accused them of misleading basketball parents into paying for basketball opportunities apparently run by Waunakee Hoops, when in fact MacKenzie and Selk were profiting from the payments. PPFOF ¶¶ 40, 42. At least a portion of the payments that apparently went to Waunakee Hoops went directly to MacKenzie and Selk instead. PPFOF ¶¶ 40, 42. Whalen pointed out that not only did that constitute fraud, but it also violated a Waunakee Area School District (WASD) policy that prohibited coaches from profiting from their positions. PPFOF ¶¶ 39, 61.

Whalen also learned that MacKenzie and Selk were gambling on high school boys' basketball games. PPFOF ¶ 43. Circumstantial evidence in the form of emails suggested that MacKenzie and Selk were both engaged in this activity. PPFOF ¶ 45. Whalen also raised this concern. PPFOF ¶¶ 46, 49.

Whalen further raised the concern that MacKenzie and Selk did not pay WASD court rental fees for activities from which they profited. PPFOF ¶ 50. Whalen believed this to be a violation of school district policy, but even if it was not, Whalen was concerned that MacKenzie and Selk were depriving the district of revenue for endeavors from which they profited. Pl.'s Resp. to DPFOF ¶ 24.

Whalen raised these concerns in formal settings and otherwise over the course of the 2022-2023 basketball season. PPFOF ¶ 28. Although it is not possible to pinpoint exactly when MacKenzie and Selk knew that Whalen had made these allegations against each of them, by the end of the 2022-2023 season, Selk and MacKenzie were aware that Mark Whalen had made each of these complaints. PPFOF ¶¶ 46- 54.

After the close of the 2022-2023 season, the WASD did not renew MacKenzie's contract to coach the boys' varsity team. PPFOF ¶ 82. Both Selk and MacKenzie believed that Whalen's complaints were a factor in the nonrenewal decision. PPFOF ¶ 83, 85.

A summer basketball program exists in Waunakee, and part of that program for summer 2023 included a basketball tournament in Appleton, Wisconsin. PPFOF ¶ 87. Selk was the coach for tournament. PPFOF ¶ 88. He announced that attending the tournament was optional. PPFOF ¶ 93. Still, Mark and Jake Whalen attended the tournament. PPFOF ¶ 92.

There were about 18 players that attended the first game of the tournament. PPFOF ¶ 91. Selk let 12 different players play in the game. PPFOF ¶ 94. Jake Whalen, however, did not receive even one minute of playing time. PPFOF ¶ 95. Jake was a superior player to at least several players who did play. PPFOF ¶ 96.

During the game and after it, MacKenzie and his brother confronted Mark Whalen. PPFOF ¶¶ 97, 105. MacKenzie said, in clear reference to the fact that Jake was not playing, "It did not have to be this way." PPFOF ¶ 98. After the game, MacKenzie's brother said to Mark, "Karma's a bitch," again in clear reference to the fact that Jake did not play in the first game of the tournament. PPFOF ¶ 105. The confrontation unnerved Mark and made him concerned for his safety if he stayed at the tournament. PPFOF ¶ 101. In light of the fact that Selk clearly was

not going to let Jake play, because the tournament was optional, and because Mark feared another confrontation, Mark and Jake left the Appleton tournament after the first game. PPFOF ¶ 104.

Sometime around August 2023, WASD named Selk as the new head coach. PPFOF ¶ 117.

In October 2023, Jake's senior year, Waunakee High School Principal Brian Borowski called a meeting for Jake, Selk, assistant coach Blake Knutson and Borowski himself. PPFOF ¶ 120. At that meeting, Jake stated that he believed he should be a rotational player his senior year on the team. He stated that he felt Selk had retaliated against him because of things his father said about Selk. PPFOF ¶¶ 124, 125. Jake stated that he cannot control his father, and that sometimes he disagreed with things his father said. PPFOF ¶ 124. Jake said that he simply wanted to be treated fairly for the 2023-2024 season. PPFOF ¶ 126. Jake did *not* say he would only be happy if he were playing in the rotation. PPFOF ¶ 233. Jake did *not* say he would rather not play at all if he was not in the rotation. PPFOF ¶ 216. Jake Whalen never stated that he felt it would be unfair to play on the scout team for the 2023-2024 varsity team: Jake's concerns with respect to fairness pertained to the way he felt Selk treated him over the summer. PPFOF ¶ 235. Jake never said he would refuse to accept a role as a scout team member. PPFOF ¶¶ 174, 175. (A scout team generally does not play in games; instead, its chief role is to prepare starters and rotational players for the upcoming games). PPFOF ¶ 74. Selk agreed that he would treat Jake fairly. PPFOF ¶ 126.

In advance of the 2023-2024 season, Selk organized and presented a parent-player-coach meeting. PPFOF ¶ 129. At the meeting, Selk stated that he intended to rid the program of "toxins." PPFOF ¶ 137, 138. He admitted that Mark Whalen was one of those toxins. PPFOF ¶ 139. Selk also made reference to the fact that ships do not sink because of water outside of the

boat: they sink because of water inside the boat. PPFOF ¶ 143. He said that either a player is "all in or all out" – there was no in between. PPFOF ¶ 202.

Too many players tried out for the varsity team in 2023-2024, forcing the need to cut the roster. During the practice portion of the tryouts, Selk made Jake practice with a group of freshmen players: Jake was the only senior to be forced to practice with the freshmen group. PPFOF ¶ 172.

Selk decided to cut Jake. PPFOF ¶ 190. It is undisputed that Jake was a better player than many players who were chosen for the team. PPFOF ¶¶ 199, 204. By cutting Jake from the team, Selk eliminated Mark Whalen's connection to the team. In Selk's mind, cutting Jake ridded the team of toxins. He told the players who made the team shortly after the decision to cut Jake, "We just got rid of the toxins. This is best for the team." PPFOF ¶ 206.

Selk claimed that he cut Jake because he believed that Jake would not accept a role on the scout team, which is where Selk saw Jake playing, at least at the beginning of the season. DPFOF ¶ 95. Jake never told Selk, or anyone else, that he would not accept such a role. PPFOF ¶¶ 174, 175, 234. Jake had a reputation as a good teammate, and none of the coaches believed otherwise. PPFOF ¶¶ 67, 183. Moreover, the team's policy is to encourage players to come forward with concerns without fears of retaliation. PPFOF ¶ 134.The coaches expect players to want more playing time. PPFOF ¶¶ 162, 171. Jake came forward in October, not on his own, but at the behest of Borowski. Jake stated his concern that he felt he was being treated unfairly in retaliation for Mark's comments, and he saw himself as a rotational player. Cutting Jake for sharing this concern does not comport with the coaching philosophy for the Waunakee boys' basketball program. Additionally, the coaches surveyed players around the time roster decisions

were made to determine definitively if players would be willing to accept their roles on the team. PPFOF ¶ 173. Selk left Jake out of that process. PPFOF ¶ 174.

In a practice very shortly after Selk cut Jake from the team, Selk told the team in reference to cutting Jake something like, "We just had to get rid of the toxins. This is best for the team." PPFOF ¶ 206.

Selk admitted that he was angered by Whalen's speech accusing him and McKenzie of fraud, gambling and unfairly using for free district-owned court space. PPFOF ¶ 55. Mark Whalen, via Jake, was water "inside the boat," that Selk had eliminated. Selk expressed his frustration that Mark Whalen could speak publicly and never face any repercussions over what he said. PPFOF ¶ 226. Cutting Jake from the team was a way for Selk to make Mark pay: Selk said he knew that Mark would be upset that he cut Jake from the team. PPFOF ¶ 231.

## III.    PROCEDURAL FACTS

Mark and Jake Whalen filed their complaint on May 23, 2024. Dct. 1. They served written discovery on Tyeler Selk. Anticipating a possible argument that Mark Whalen's speech was false, Mark and Jake attempted to gather facts to counter that argument. With particular respect to the fraud allegations, the Whalens' asked Selk: "Describe your relationship to Waunakee Hoops from January 1, 2021, through June 2023. If you profited from your relationship, explain the method by which you received payment." PPFOF ¶ 224.

Selk responded:

Defendant objects to this interrogatory as the term 'Waunakee Hoops' is undefined and vague as it is not clear if it is intended to refer to the Waunakee High School Boys Varsity Basketball team, programs outside of the school, or Waunakee Hoops Club, Inc, a 501(c)(3) non-profit organization that offers boys in the Waunakee Community School District opportunities to participate in basketball programs. Defendant also objects to this

interrogatory as it seeks information that is not relevant to the allegations in the amended complaint and to the extent there is any limited evidentiary value, such minimal value is not proportional to the needs of the case. The only claim in this case is for First Amendment retaliation. Mark Whalen's alleged protected activity involves him speaking publicly about Selk's and MacKenzie's "seemingly fraudulent use of money in running their basketball camps . . ." [ECF 6, ¶ 16]. While according to the Amendment Complaint, Waunakee Hoops is an entity that Mark Whalen referenced to the School Board in October 2022, Defendant's relationship to that entity or whether Defendant profited from that entity is irrelevant to Mark Whalen's claim that his statements were protected activity. These topics of information are not related to the claims or defenses in this case and appear to be an attempt to annoy and harass Defendant. Moreover, this this interrogatory is also intended to impermissibly seek information that Mark Whalen's prior counsel Michael Brandt was unsuccessful in obtaining in *Eastbridge Law Group, LLP v. Waunakee Community School District, et al*., Dane County Case No. 22-cv-2546. Attorney Brandt (who was identified as a witness in this matter by Plaintiffs in their initial disclosures), on behalf of a group of Waunakee School District residents including Mark Whalen, brought an unsuccessful Wisconsin Public Records lawsuit against the Waunakee Community School District seeking documents related to Waunakee Hoops including the same types of financial information sought in this interrogatory. That lawsuit was dismissed on August 11, 2023 after the court found that Plaintiff, Mr. Brandt's law firm Eastbridge Law Group, LLP, had not established a right to relief under Wis. Stat. § 19.37. Plaintiffs cannot utilize this lawsuit to obtain records and information that were not required to be disclosed in the Public Records lawsuit and that are irrelevant to the claims and defenses asserted in this case. Subject to and without waiving any objections, Selk has been involved with Waunakee Hoops Club, Inc, since 2003.

PPFOF ¶ 224. Selk repeated his objection to the related request for production of documents, producing nothing. PPFOF ¶ 224.

On October 16, 2024, Mark and Jake Whalen served a subpoena on the Waunakee Police Department seeking the investigation files into MacKenzie and Selk related to Mark Whalen's report to the police. Dct. 18-1. Again, this was to seek facts to disprove any contention that Mark Whalen's complaints were made in bad faith.

Selk moved to quash the subpoena. Dct. 17. One of the grounds upon which he moved was that the information sought by the Whalens was immaterial. Dct. 17, p. 2. Selk stated:

Plaintiff's subpoena appears designed to inquire into why the police determined that there was no basis to pursue Mark's allegations. Assuming that this accusation to the police was legally protected activity, to make a prima facie case, Mark will only need to present

evidence that he engaged in the activity. The merits of that determination are of no import to the First Amendment claim here.

Dct. 17, p. 4.

In opposing Selk's motion, Mark Whalen specifically raised the issue that he might be called upon to demonstrate that his statements were not false or reckless. Dct. 21, p. 3-4. The court accepted the defendant's argument that the information was irrelevant. Dct. 24, p. 5. The court ignored the possibility that the police could have gathered information unknown to Mark from other sources supporting the veracity of Mark Whalen's claim. Regardless, Selk was successful in limiting Mark Whalen's attempt to gather information that would show his speech was true.

## IV.    STANDARD OF REVIEW.

Summary judgment is appropriate only if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *FKFJ, Inc. v. Vill.of Worth,* 11 F.4th 574, 584 (7th Cir. 2021). All reasonable inferences are to be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986). Credibility determinations are for the jury, not the court. *FKFJ, Inc.*, 11 F.4th at 585. Circumstantial evidence precludes summary judgment if it would allow a jury to draw a reasonable inference in support of the non-moving party. *Jones v. Van Lanen,* 27 F.4th 1280, 1286 (7th Cir. 2022).

## V.    MARK WHALEN'S FIRST AMENDMENT CLAIMS SHOULD NOT BE DISMISSED.

To prevail on his claim, Mark Whalen must prove that 1) his speech was constitutionally protected; 2) he has suffered a deprivation likely to deter speech; and 3) his speech was at least a motivating factor in Selk's actions. *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013), *Redd v. Nolan*, 663 F.3d 287, 294-295 (7th Cir. 2011), *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir.

2020). This standard applies to government employees and non-employees alike. *Douglas,* 964 F.3d at 646. If the plaintiff establishes his prima facie case, the burden shifts to the defendant to show that the defendant would have taken the adverse action without the protected speech. *Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011).

A.   *Mark Whalen's speech was constitutionally protected.*

Speech is protected unless the defendant can prove that the speaker in fact knew his speech was false or was recklessly indifferent to the fact. *Sizelove v. Madison-Grant United Sch. Corp.*, 597 F.Supp.3d 1246, 1273 (S.D. Ind. 2022).

Mark Whalen's speech at issue in this case involves three accusations. He accused Selk of engaging in fraud. He claimed that Selk was hiding behind Waunakee Hoops to disguise the fact that he was profiting from activities that appeared to be associated with Waunakee Hoops. Parents would be led to believe they were paying a non-profit organization when in fact the money was going to Selk without disclosure. Not only was this fraud, but it also violated WASD policies that prohibited coaches from profiting by running camps.

Mark also complained that the coaches were using public gyms (for which they did not pay) as part of their for-profit Waunakee Basketball business. Regardless of whether it violated school policy, it deprived the district taxpayers of revenue to which they would otherwise be entitled to subsidize a for-profit business.

Finally, Mark accused Selk of gambling on high school basketball games.

The only argument Selk makes that Mark's speech was not protected is to claim that Mark's speech was made in reckless disregard for the truth; that is, that Mark's claims were false and that he knew they were false but made the speech anyway. For the reasons that follow, the court should reject those arguments.

1. Selk should be judicially estopped from arguing that Whalen's claims were false.

Judicial estoppel prevents a party from prevailing on an argument made earlier in a matter and then relying on a contradictory argument to prevail on a subsequent matter. *Wells v. Coker,* 707 F.3d 756, 760 (7th Cir. 2013), *Sanders v. JGWPT Holdings*, 2017 U.S. Dist. LEXIS 158138, *15-16 (N.D. Ill). To determine if judicial estoppel should apply, a court is to examine three factors: 1) whether a party's positions are clearly inconsistent; 2) whether the party succeeded in convincing the court to abide by the earlier position; and 3) whether the party would derive an unfair advantage if not judicially estopped. *Wells* 707 F.3d at 760, *Murata Mfg. v. Bel Fuse,* 422 F.Supp.2d 934, 947 (N.D. Ill. 2006). Judicial estoppel protects courts from being manipulated by chameleonic litigants who seek to prevail twice, on opposite theories. *Spina v. Forest Pres.,* 2001 U.S. Dist. LEXIS 19146 *24 (N.D. Ill.).

As noted above, Mark Whalen attempted to conduct discovery to produce facts to show that his claims of financial misconduct were true, or at least that Mark had a good faith basis to believe so. On October 16, 2024, Mark and Jake Whalen served a subpoena on the Waunakee Police Department seeking the investigation files into MacKenzie and Selk. Dct. 18-1. Again, this was to seek facts to disprove any contention that Mark Whalen's complaints were made in bad faith.

Selk moved to quash the subpoena. Dct. 17. One of the grounds upon which he moved was that the information sought by the Whalens was immaterial. Dct. 17, p. 2. Selk stated:

> Plaintiff's subpoena appears designed to inquire into why the police determined that there was no basis to pursue Mark's allegations. Assuming that this accusation to the police was legally protected activity, to make a prima facie case, Mark will only need to present evidence that he engaged in the activity. The merits of that determination are of import to the First Amendment claim here.

Dct. 17, p. 4.

In opposing Selk's motion, Mark Whalen specifically raised the issue that he might be called upon to demonstrate that his statements were not false or reckless. Dct. 21, p. 3-4. The court accepted the defendant's argument that the information was irrelevant. Dct. 24, p. 5. The court ignored the possibility that the police could have gathered information unknown to Mark from other sources supporting the veracity of Mark Whalen's claim. Regardless, Selk was successful in limiting Mark Whalen's attempt to gather information that would show his speech was true.

Selk's position with respect to the subpoena was consistent with his refusal to respond to Mark Whalen's discovery request about whether Selk committed fraud. Selk claimed that whether he committed fraud was "irrelevant" to whether Mark's speech was protected. Selk claimed that his "relationship to [Waunakee Hoops] or whether Defendant profited from that entity is irrelevant to Mark Whalen's claim that his statements were protected activity." Selk stated that this information was unrelated to defenses, and that the question was asked exclusively for the purpose of harassing or annoying Selk. His response to the document production referred back to his response to the interrogatory, which was no response at all.

Selk's position during discovery is inconsistent with his position now. Now, he argues that Mark Whalen's speech showed a reckless disregard for the truth. During discovery, Selk argued that questions pertaining to how he raised money through Waunakee Hoops was irrelevant and intended to harass him. Selk convinced the Court to limit the scope of the Whalen's subpoena and served as a basis to refuse to answer discovery. (If Selk was going to claim that fraud issues were irrelevant, the plaintiff had no reason to bring a motion to compel). This gives Selk an unfair advantage. He prevented Mark Whalen from getting information substantiating his claims and now argues that a lack of information shows that Mark's claims

were knowingly baseless. Selk should be estopped from claiming earlier in the case that questions about his business relationship with Waunakee Hoops was out of bounds, only to later use Whalen's inability to get relevant information as evidence that Whalen's claims knowingly lacked merit.

2. Even if Selk is not estopped, an issue of fact exists over whether Whalen's speech included allegations made in good faith.

Whether speech is made with a reckless disregard for the truth is a factual issue. *Swetlik v. Crawford*, 738 F.3d 818, 827-828 (7th Cir. 2013). A speaker is not required to prove the truth of his speech in order to secure the protections of the First Amendment. *Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 942 (7th Cir. 2004).

Ample evidence exists to support the conclusion that Mark Whalen had a good faith basis to accuse Selk of financial impropriety. Whalen learned that MacKenzie and Selk were being paid directly through a website that made it look like the money was going to Waunakee Hoops Clubs, not MacKenzie and Selk. PPFOF ¶ 40. Pat Whalen would mail checks to Selk's address ostensibly for Waunakee Hoops. PPFOF ¶ 40.

A check for $10,045 was paid from Waunakee Hoops to Waunakee Basketball because a sports payment portal, SportsEngine, directed payments that should have been paid to Waunakee Basketball to Waunakee Hoops. PPFOF ¶ 41.

In May 2023, a report from accounting firm KMA concluded, "Based on the documents and information collected, the information supports the fact that Dana MacKenzie and Tyler Selk have received a private benefit through the use of Waunakee Hoops Club's name, charitable status and payment platform." PPFOF ¶ 42. "The individuals have used the charitable organization as a conduit to collect registration fees on their behalf, either personally or to

entities under their control. The public has been misled to believe that they are supporting a charitable organization, while the supporting documentation indicates otherwise." PPFOF ¶ 42.

Although the KMA report does not use the word "fraud," that is the clear implication to be drawn from the language of the report.

For the purposes of the response to this motion, Whalen is *not* required to prove that Selk actually committed fraud. He must merely establish that he had a basis for believing it. The record is littered with evidence consistent with Selk misleading the public about him profiting from activities that appeared to be part of a non-profit organization.

Additionally, the complaints about Selk using Waunakee basketball courts for free to his financial advantage was admittedly true. Whether it was a violation of any policies is immaterial because the point of Whalen's complaint was that the WASD was subsidizing Selk's for profit business.

In his brief, Selk did not even raise an issue about whether Mark Whalen's speech about Selk's gambling was made with a reckless disregard for the truth, so he should not be allowed to do so in reply. Regardless, Whalen had a good faith basis to believe Selk was gambling. James Shadeberg, a former coach with firsthand knowledge, told Mark Whalen that the coaches gambled, and emails were produced that were consistent with Selk gambling. Again, Whalen is not required to prove that Selk actually was gambling. But Mark Whalen has produced evidence to show he had a good faith belief that Selk was betting on high school games.

The district's investigation discounting Mark Whalen's allegations do not somehow render Mark's accusations as made in bad faith. The WASD did not conclude that no fraud took place; instead, it concluded that because the money at issue was not public funds, the WASD was uninterested in the matter. Likewise, the district attorney's decision not to press charges also does

not transform Mark Whalen's complaints into bad faith attempts to punish Selk. The district attorney's office did not *disprove* Mark's claims – it simply decided not to prosecute.

Selk raises several other irrelevant matters in his brief. It is false that an issue from when Jake was in third grade motivated Mark Whalen with respect to his conduct directed at MacKenzie or Selk. It is absurd to conclude that Mark would attempt to remove MacKenzie as coach to get more playing time for his son before Jake even played on MacKenzie's team. Regardless, *MacKenzie* did not cut Jake from the team, or decide the distribution of playing time at the Appleton tournament. Instead of belaboring these completely immaterial "facts," Mark simply refers the court back to the evidence that matters. Mark (and other parents) saw evidence that MacKenzie and Selk were engaging in financially improper conduct and brought those concerns forward, along with other concerns that he had a good-faith basis to believe in.

At a minimum, there is a jury question over whether Mark Whalen's speech was made in bad faith with respect to the fraud claims. Accordingly, summary judgment on the grounds that Mark Whalen's speech was made in bad faith should be denied.

B. *Mark Whalen's speech was at least a motivating factor in Selk's actions.*

Selk does not contest that failing to play Jake Whalen at the Appleton tournament and cutting him were adverse actions sufficient to deter speech. Instead, he argues that there is no evidence that Mark Whalen's speech was a factor in Selk's decision to cut Jake from the team.

The record is replete with evidence that Mark Whalen's speech was a factor in Selk's decision to cut Jake.

- Selk was aware of Mark Whalen's speech accusing him of financial misconduct, abusing his privilege to use the basketball courts for no charge and for gambling on basketball games. PPFOF ¶¶ 53, 54.

- Selk was upset and frustrated over Mark Whalen's accusations, against both Selk and MacKenzie. PPFOF ¶¶ 55, 56.

- At the pre-season meeting, Selk stated that he was going to rid the program of toxins. PPFOF ¶ 138. Selk admitted that "toxin" was an indirect reference to Mark Whalen. PPFOF ¶ 139.

- Selk admitted that he felt Mark was a toxin because Mark had accused him of fraud, gambling and misusing the free courts.  PPFOF ¶ 140.

- Selk stated that it was not the water on the outside that sank ships, but the water on the inside. PPFOF ¶ 143. Again, this was a reference to ridding the basketball program of Mark Whalen.

- In a text message, Selk expressed frustration that Mark Whalen could say whatever he wanted without facing any repercussions. PPFOF ¶ 226.

- Ample evidence exists to prove that Selk made the decision to cut Jake, and the other coaches simply concurred. PPFOF ¶¶ 190 – 199.

- Players chosen to be on the scout team were interviewed to ensure that they would be content with their roles. PPFOF ¶ 173. No one asked Jake if he would accept being on the scout team when the alternative was being cut from the team. PPFOF ¶ 174, 175.

- Selk told his team after the decision to cut Jake that he had no choice: he had to rid the team of toxins. PPFOF ¶ 206

- Selk knew that cutting Jake would hurt Mark. PPFOF ¶ 231.

It is worth digressing to emphasize the evidence that Selk made the decision to cut Jake. Selk *admitted* that he was the person who decided to cut Jake from the team. Selk said "…we (I)

made a decision. Did what I thought was best for our program currently and going forward."

PPFOF ¶ 190.

> Selk testified:
>
> Q: What was your role in deciding whether Jake made the '23-24 varsity team?
> A: I was the head coach.
> Q: And what was your role as the head coach with respect to establishing the criteria for who made the team?
> A: It was my call.

PPFOF ¶191.

> Selk had the final say about who would make the roster. PPFOF ¶ 192.

> Selk led the discussion about who would be cut. PPFOF ¶ 193.

After the second day of tryouts, Selk said he was going to cut Jake. PPFOF ¶194. When Selk stated his conclusions, Knutson agreed with him. PPFOF ¶198. Knutson never said that he did not feel Jake should not be on the team: he only said that he believed about ten players were ahead of Jake on the roster. PPFOF ¶ 199.

Jared and Ryan Staege had no experience with Jake Whalen to judge him as a player beyond watching him at tryouts. PPFOF ¶196. Jared and Ryan Staege added little to the decision about whether Jake should be cut. PPFOF ¶ 196. Ryan Staege admits that Selk made the decision about cutting Jake, and that he simply approved because he trusted Selk. PPFOF ¶ 195. Jared Staege testified that Selk did not explain *Selk's* decision to cut Jake. PPFOF ¶ 197.

Accordingly, an issue of fact exists with respect to whether Selk was the decisionmaker with respect to cutting Jake from the team.

In Selk's brief, the defendant makes a multitude of unsupported or disputed factual assertions to prove that Mark's speech was not a factor in the decision to cut Jake. For example, Selk claims that a meeting called by Principal Brian Borowski at the beginning of Jake's junior

season somehow proves that Selk did not retaliate against Mark by cutting Jake. Selk never claimed that this meeting was a factor in his decision, and it was not even called by Jake or Mark. It does nothing to discount the clear importance Selk placed on ridding the team of toxins.

Selk also claims that because Mark Whalen dismissed his claims against MacKenzie, Mark is somehow precluded from arguing that retaliation did not begin Jake's junior year. Dct. 42, p. 12. To the extent that it is relevant, there is a plethora of facts proving that MacKenzie retaliated against Jake that season, as shown in the Plaintiffs' Proposed Findings of Fact.

Selk also argues that the timing of Mark's complaints cannot support a finding of retaliation for Selk cutting Jake from the team. That is an absurd claim: Selk could not cut Jake from the team until the time at which the team was chosen. It ignores the fact that Selk said he was going to rid the team of toxins, which meant Mark and Jake Whalen, just before the roster decision was made. It also ignores the fact that the first opportunity Selk had to retaliate against Jake (the Appleton tournament), Selk took advantage of it.

In sum, Selk does not even make an effort to discount the substantial evidence that Selk cut Jake as way to punish Mark, to rid the program of "toxins," to get rid of the water *inside* the boat. For this reason, the motion for summary judgment should be denied.

C. With the burden shifting to the defendant to prove he would have made the same decision irrespective of Mark's speech, Selk's motion for summary judgment should fail.

Selk claims that if Mark Whalen had never complained about his misconduct, the undisputed facts lead inexorably to the conclusion that Selk would have cut Jake, anyway. For the reasons that follow, a jury, not the court, should make that decision.

Selk's defense revolves entirely around Jake stating at the October 2023 meeting that he felt he would be treated unfairly if he were not in the rotation: that it would be retaliation for

Mark's speech. First, Jake never actually said that. PPFOF ¶ 235. But even if Selk inferred it, Jake's comment is impossible to disentangle from Mark's complaints. If Mark had never accused Selk and MacKenzie of misconduct, Jake's experiences in his junior year and over the summer would have been entirely different and viewed in a completely different manner. Jake's complaint of unfair treatment is enmeshed with Mark's speech. Indeed, the meeting was called in October in part to deal with what *Borowski* perceived to be a potential problem flowing from Mark's speech. In other words, but for Mark's speech, there would not have been an October meeting, nor would Jake have implied that he believed keeping him out of the rotation would have been unfair and retaliatory.

But even if Jake had told Selk in October that he would have felt keeping him out of the rotation would have been unfair, Selk would not have interpreted the comment in the same way. Selk's "all in or all out" philosophy would not have applied: Jake would not have been associated with a toxin. Jake would have been treated like any other player who complained about his playing time or civilly disagreed with the coaches about where he belonged on the team. Jake was an excellent teammate with a record of a good attitude. Selk himself complimented Jake on his efforts on the scout team his junior year. PPFOF ¶ 75. Without Mark's complaints serving as Jake's perception of unfair and retaliatory treatment, Jake's assertion to the coaches that it was unfair to keep him out of the rotation becomes a routine expression of concern that did not merit the drastic penalty of cutting Jake from the team. That is especially true when Selk admits that players lower in skill than Jake were kept on the team. PPFOF ¶¶ 180, 204.

In other words, Selk is asking the court to conclude as a matter of law that he would have cut, without warning, a well-liked, hard-working senior simply because that senior said he thought it was unfair that he was not in the rotation, especially when he spent time in the rotation

the prior season. This would be at odds with the coaches' testimony that players are encouraged to share concerns, that they are encouraged to be hungry to get on the court, that every player has a chance to work their way into the rotation, that because of injuries and illnesses rotation spots open up and that no player is punished for thinking they are better than what the coaches believe. But for Mark Whalen's speech, coaches would have approached Jake before any cutting decisions were made, to determine if Jake would accept his role, as they did with other players. They would have learned that while Jake would have been disappointed, he would have preferred the scout team at the beginning of the year to being cut.

At page 17 of his brief, Selk sets forth a litany of disputed facts, then states, "on these undisputed facts," what transpired at the October meeting with Selk, Knutson, Jake and Borowski forecloses the possibility that Mark (or Jake) could prevail on the motion for summary judgment. Jake did not say he would be unhappy if he was not in the rotation. PPFOF ¶ 154 175, 216. He never said he preferred to be cut if he was not in the rotation. PPFOF ¶ 175. He *did* say he thought it would be unfair if he were not in the rotation, tying that decision to punishment directed at his father because of Mark's accusations against Selk. But Selk and the other coaches concede that players are encouraged to come forward with concerns. PPFOF ¶ 134. Players do not face retaliation for telling the coaches they want more playing time. PPFOF ¶¶ 165, 166. Coaches do not punish players for believing they are better than what the coaches observe. PPFOF ¶ 161.

At the post-cut meeting, Selk told Jake that he decided to cut him because "you were all in or all out, there is no in between." PPFOF ¶ 202. That criterion was created as the result of Mark Whalen's conduct, as the parent-player meeting bears out. But for Mark Whalen's speech, the "all in or all out" criterion would not have been in place, and Jake would not have been cut

his senior year. An issue of material fact exists with respect to whether Selk would have cut Jake but for Mark's speech.

### VI.    JAKE WHALEN'S FIRST AMENDMENT CLAIMS SHOULD NOT BE DISMISSED.

The same legal standards apply to Jake's claim that applies to Mark's claim. And the same issue exists with respect to Jake's complaint at the October meeting being intrinsically tied to Mark's speech. Selk claims that he cut Jake because Jake felt it would have been unfair not to include him in the rotation, but Jake felt it would have been unfair because of his father's speech. Selk claims that he would have cut Jake irrespective of his protected speech. Jake's speech was a concern that he was being treated unfairly by not being in the rotation. If Jake's speech had not occurred, then Selk's entire basis for cutting Jake disappears. Selk would not have told his team after the decision to cut Jake that Selk had no choice – Selk had to cut the "toxins" from the team.

With respect to Jake leaving the Appleton tournament without telling the coaches, ample evidence contradicts a claim by Selk that Jake's departure from that tournament, by itself, was the cause of Selk cutting Jake from the team. Selk never told Jake that it concerned him. PPFOF ¶¶ 103, 107. Selk did not mention Jake's departure from the Appleton tournament as a reason for Selk's decision to cut him at the post-cut meeting. PPFOF ¶ 205. It was a fact known to Selk before the tryouts. If Jake's departure from the tournament disqualified Jake from being on the team, it contradicts Selk's claim that he had supposedly not made a decision to cut Jake until after the tryouts were complete. PPFOF ¶ 194, DPFOF ¶ 87.

Of course, Selk should be free to argue to the jury that he would have cut Jake irrespective of Jake's complaint. But there are issues of fact that preclude this court making that determination. The motion for summary judgment should be denied.

VII.    CONCLUSION

For the reasons stated above, the motion for summary judgment should be denied with respect to both Mark Whalen's and Jake Whalen's claims.

Dated this 6th day of May, 2025.

GINGRAS, THOMSEN & WACHS, LLP
Attorneys for Plaintiffs

By:     *Electronically signed by Paul A. Kinne*
Paul A. Kinne
State Bar No. 1021493
Robert J. Gingras
State Bar No. 1002901

8150 Excelsior Drive
Madison, WI 53717
Phone: (608) 833-2632
Fax: (608) 833-2874
e-mail: kinne@gtwlawyers.com
        gingras@gtwlawyers.com