IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MARK WHALEN
and JAKE WHALEN,

                            Plaintiffs,                    OPINION and ORDER

        v.                                                        24–cv–342–jdp

TYLER SELK,

                    Defendant.

---

Disputes between a high school coach and an athlete's parent are common, but most of those disputes do not lead to multiple internal investigations, a police report, and a federal lawsuit. This one did.

Jake Whalen played basketball for Waunakee High School from his freshman through junior year. During much of that time, Jake's father, Mark Whalen, was complaining to school officials about head coach Dana MacKenzie and assistant coach Tyler Selk.[1] Mark says that he was primarily concerned about potential financial misconduct by the coaches related to a private basketball camp they ran. Selk says that Mark's real beef was a long-simmering disagreement about Jake's playing time.

Over the course of more than a year, Mark's complaints escalated, culminating in both school district and police investigations. Neither the police nor the school district found any misconduct, but at the end of Jake's junior year, the school district chose not to renew MacKenzie's contract—without giving a reason—and Selk became the head coach. The following year, Selk cut Jake from the varsity team. Selk admits that Jake was a better player

---

[1] The court will refer to the Whalens by their first names to avoid confusion.

than other students who made the team, but Selk says he cut Jake anyway because of a concern that Jake's perception of his ability was unrealistic, and he would not have been happy with his place on the team. Jake and Mark contend that Selk was angry with Mark and Jake because of Mark's accusations and because Jake confronted Selk in front of the principal about wanting to be treated fairly.

The Whalens are suing Selk under 42 U.S.C. § 1983, contending that Selk retaliated against them for exercising their right to free speech under the First Amendment. Selk moves for summary judgment, contending that Mark's speech was false and reckless, so it was not constitutionally protected, and, in any event, Selk's decision to cut Jake was not related to any of Mark or Jake's criticism.

There are material factual disputes about both the content of Mark's speech and the reasons for Selk's decision. "[S]ummary judgment is improper in a discrimination case where a material issue involves any weighing of conflicting indications of motive and intent." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 974 (7th Cir. 2012) (internal quotation marks omitted). So a jury will have to weigh the evidence and determine whether Selk violated Mark and Jake's First Amendment rights.

## UNDISPUTED FACTS

The following facts are undisputed except where noted.

During the time relevant to this case, Jake was a student at Waunakee High School. He graduated in 2024. Mark is Jake's father. During Jake's freshman, sophomore, and junior year, Selk was an assistant coach for the boys' varsity basketball team. He became head coach for Jake's senior year.

As a freshman, Jake was a starter on the freshman team, and he played every game. During his sophomore year, Jake was on the junior varsity basketball team, and again he was a starter.

## A. Mark's allegations

In 2022, during the summer before Jake's junior year, Mark and other parents spoke to principal Brian Borowski and other Waunakee school district officials about multiple "concerns" they had with Selk and Dana MacKenzie, who was then the head coach for the boys' varsity basketball team and a close friend of Selk. Dkt. 92, ¶ 28.[2] The details of Mark's statements are hazy, but the parties appear to agree that Mark raised three allegations that implicated Selk:

1. MacKenzie and Selk ran private basketball camps for teens during the summer under the name Waunakee Basketball. Every year, Waunakee Hoops, a nonprofit booster club for the high school's basketball program, sent out an email promoting the camps and explaining how to sign up and pay for them, even though Waunakee Hoops did not run the camps and did not receive any money from them. Mark and some other parents believed that MacKenzie and Selk were misleading parents into believing that fees for the camps were going to Waunakee Hoops when those fees were actually going to MacKenzie and Selk.[3]

2. MacKenzie and Selk did not have to pay the school district for their use of the high school basketball court for the camps, even though the camps were not affiliated with the school district and MacKenzie and Selk were charging students for the camps.

3. Mark had heard from a friend that MacKenzie and Selk were gambling on Waunakee sports.

---

[2] MacKenzie was initially a defendant in this case, but the Whalens voluntarily dismissed him. Dkt. 39.

[3] The Whalens also say that payment for the camps was made "directly through a website that made it look like the money was going to Waunakee Hoops Clubs," Dkt. 92, ¶ 40, but they do not provide a screenshot of the relevant website or otherwise explain what they mean.

Mark repeated similar allegations in other meetings and communications with school officials throughout the 2022–23 school year, including a closed session with the school board where MacKenzie was present. Other examples of Mark's allegations include:

- Mark told the superintendent that he had heard from a friend that coaches were gambling on Waunakee sports or Waunakee basketball. Mark did not file a complaint with the district because he "didn't have the evidence." Dkt. 89 (Mark Whalen Dep. 57:1–21).

- In multiple communications, Mark raised a new issue about the camps after discovering that more than $10,000 had been transferred from the bank account for Waunakee Hoops (the nonprofit booster club) to the account of Waunakee Basketball (the private organization that MacKenzie and Selk ran). In one email, Mark referred to this as "funneling money" from Waunakee Hoops to Waunakee Basketball. Dkt. 60-2.[4]

- In April 2023, Mark told the superintendent that he believed that MacKenzie and Selk's basketball camps were violating a district policy prohibiting coaches from selling or promoting services to students. Dkt. 60-3.

In November 2022, MacKenzie received a letter from the school superintendent, informing him that a parent was alleging that MacKenzie "had been involved in financial misconduct involving funds of the Waunakee Hoops Club, Inc." and that MacKenzie "was gambling on high school sports." Dkt. 59-2. The letter also stated that the school district had investigated the allegations, and "[n]o evidence was found" to support them. *Id.* MacKenzie was aware that Mark was behind these accusations.

---

[4] The Hoops' treasurer later explained that checks meant for Waunakee Basketball "were erroneously deposited" into the Hoops bank account, so Hoops issued a "refund check" to Waunakee Basketball. Dkt. 60-2.

**B. Jake's junior year**

Jake was on the varsity basketball team for the 2022–23 season, his junior year. The varsity team typically was comprised of between 15 and 20 players, including 5 starters and 4 or 5 main reserve players, who were called "the rotation."

Jake was not one of the five starting players during his junior year. He did not play at all during the first two games of the season. For the next five games, Jake was included in the rotation, and he played between 5 and 13 minutes during each of those games. After the seventh game, MacKenzie removed Jake from the rotation. For the remainder of the season, Jake played only in games in which Waunakee was winning or losing by a large margin. Over the course of the season, Jake ranked tenth on the team for minutes played. Selk provided input on how much playing time a student would receive, but MacKenzie made the final decision. Neither side put in any evidence about metrics of Jake's performance, such as how many points he scored.

At the end of the 2022–23 season, the school district decided not to renew MacKenzie's contract. No reasons were provided. Selk disagreed with the school district's decision against MacKenzie, and Selk believed that Mark had played a role in the decision.

At some point before MacKenzie was removed as head coach, Selk became aware that Mark was accusing Selk himself of financial misconduct involving the basketball camps. Around the same time, Selk learned of accusations against him related to gambling on games, but he did not "know Mark's involvement directly." Dkt. 85 (Selk Dep. 11:17–25). Selk says that he "probably" learned around the same time about Mark's contention that it was improper for Selk and MacKenzie to use the high school basketball courts for their privately run basketball camps without paying the school district. *Id.* at 12:5–12.

**C.  Summer between Jake's junior and senior year**

Over the summer of 2023, some of the players on the Waunakee basketball team participated in a tournament run by Mackenzie and Selk. Anyone who was eligible for the varsity team, including Jake, could participate. Selk decided playing time. He did not allow Jake to play in the first game. During the game, Mark had a conversation with MacKenzie. MacKenzie said, "How are you feeling about this? It didn't have to be this way." After that, Jake and Mark left the tournament, without saying anything to the coaches. After the game, Selk learned that Mark and MacKenzie had a "hostile" interaction. Dkt. 85 (Selk Dep. 28:23–25). MacKenzie "may have" told Selk what was said during the conversation. *Id.* Selk did not know why Jake left, and he never spoke to Jake or Mark about it.

During summer 2023, Jake participated in summer leagues with the basketball team. Jake says that Selk "never talked to [him], wouldn't look at him," and "just basically ignore[ed] him" during the summer league games.

In August 2023, the school district chose Selk as the new head coach. Selk believed that Mark opposed that decision.

In August 2023, Mark and an attorney went to the police with allegations about MacKenzie and Selk. Neither party identifies specifically what Mark said to the police. A police report summarized the statements as "concerns with some Waunakee High School Basketball coaches profiting from a basketball camp they hosted via a non-profit booster club that supports Waunakee Boys Basketball." Dkt. 46-2, at 1. Another portion of the report stated that Mark "had some concerns regarding activities of the basketball coaches that [he] believed were possibly illegal." *Id.* at 46-2, at 3. No charges were filed.

6

**D. Jake's senior year**

In October 2023, principal Borowski called a meeting between Selk and Jake "to establish communication between player and coach." Dkt. 92, ¶ 121. The parties do not say in their proposed findings of fact why Borowski perceived that there was a communication problem between the two, but Selk states in his deposition that the meeting was about Mark's "involvement with the removal of" MacKenzie, and Mark's "disagreement with [Selk's] appointment as head coach." Dkt. 85, at 34:1–13. Among other things, Borowski stated during the meeting that its purpose was to "clear the air and just make sure that there was going to be fairness in the process and . . . not to hold Jake responsible for Mark's frustrations." Dkt. 82 (Borowski Dep. 14:5–10). Borowski does not say why he was concerned about Selk holding Jake responsible for something Mark said or did, but Selk stated in his deposition that Jake "may or may not have" said something along the lines of "I can't control what my dad says or does." Dkt. 85, at 119:16–20.

The parties agree that Jake stated during the meeting that he believed he was good enough to be in the rotation and that he wanted to be treated fairly on the team. According to Selk, Jake said that he would not feel like he was being treated fairly unless he was "a starter or one of the first players off the bench." Dkt. 45, ¶ 7. Jake denies saying that he would be happy only if he was in the rotation. Dkt. 61, ¶ 5. Borowski remembers Jake saying that he wanted to be treated fairly but not that he would be happy only if he was in the rotation.

At some point before the 2023–24 season began, Selk led a meeting with coaches, students, and parents, including Mark. During the meeting, Selk showed a series of PowerPoint slides that covered various topics, including the role of Waunakee Hoops, communications with parents, and expectations of players. One of the slides was titled "Waunakee Basketball –

Toxins." Bullet points included "Complaining, deflective & descriptive behaviors of who's done things incorrectly" and "Defame the ability of players and leaders within our program." Dkt. 45-1. When asked during his deposition whether the slide was about Mark, Selk said "not directly," but when a follow-up question asked whether Selk considered Mark to be "among a group of people who were toxins in the program," he said, "Absolutely." Dkt. 85, at 39:1–4. When counsel asked whether Selk thought Mark was a toxin for accusing Selk of "taking money," "gambling on high school games," and "using [Selk's] spot as a coach to get free gym time for personal gain," Selk answered "yes," and "[t]hose accusations are toxic" *Id.* at 39:8–20.

According to Mark, Selk stated during the meeting that "his good friend" MacKenzie was let go, and "[e]verything that was said about him wasn't true, but going forward, you're either all-in or all-out." Dkt. 89 (Mark Whalen Dep. 34:3–16). According to another parent at the meeting, Selk "mentioned his disappointment in MacKenzie being dismissed." Dkt. 92, ¶ 6. Selk then said (according to Mark), "We are weeding out the toxic parents" or "We're getting rid of the toxic parents," and he talked about "toxic parents" for at least five minutes. Dkt. 89 (Mark Whalen Dep. 34:3–16).

Tryouts for the 2023–24 varsity team were held in November 2023. Jake says that he was the only senior required to practice with freshman during tryouts. Selk says that "other students" also practiced with freshman because many juniors and seniors were still playing football. Dkt. 91, ¶ 86.

Either just before or after the coaches set the team roster, they asked at least three players whether they would accept a position on the team even if they were not in the rotation. No coach had that conversation with Jake.

8

Out of 24 students who tried out, Selk and the assistant coaches picked 19 students for the varsity team. Selk says that he would have ranked Jake as the 12th best player who tried out. Each of the assistant coaches would have ranked Jake somewhere between 10th and 15th. Jake was not selected for the team. Selk admits that Jake was more skilled than some students who did make the team.

Selk discussed the decision with the assistant coaches, but he made the final call. In fact, he stated during the second day of tryouts that he was going to cut Jake. Only one other senior did not make the cut, and he had attendance problems.

Selk had a conversation with Jake about why he did not make the team. The conversation was recorded. Dkt. 46, Exh. D. The parties do not say who recorded the conversation or why, but they agree the recording is authentic. Selk told Jake that the coaches did not see Jake as a "rotational player," and Jake had made statements suggesting that he would not believe he was being treated fairly and would be unhappy if he did not make it into the rotation. So Selk said that Jake would not be an "all in" player. Selk referred specifically to Jake's comments during the October 2023 meeting with the principal. In his deposition, Selk said that he also considered Jake's decision to leave the summer tournament without telling the coaches after he did not play in the first game. Dkt. 85, at 63:15–64:1. Selk did not express that concern to Jake.

According to several students on the team, Selk said something like, "We just had to get rid of the toxins" and "This is for the best for the team" during one of the first practices of the season. Dkt. 92, ¶ 206; Dkt. 78, ¶ 14. Selk and the assistant coaches deny that Selk said this. Dkt. 92, ¶ 206.

Jake filed an administrative complaint with the school about being cut from the team. Selk discussed that complaint in text messages with the coaching staff. Selk stated, "Mark is convinced that he can win this battle and get me fired . . . . [H]e thinks he can say absolutely whatever he wants and it won't be held against him." Dkt. 59-3, at 17–18. The district denied Jake's complaint.

ANALYSIS

Both plaintiffs assert a single claim that Selk cut Jake from the varsity team because of their speech, in violation of the First Amendment. The parties agree that a plaintiff can assert a First Amendment claim about his own speech only, so Mark's claim is based on his allegations of misconduct against Selk, and Jake's claim is based on his statements during the October 2023 meeting with Selk and the principal.

A retaliation claim under the First Amendment has three elements: (1) the plaintiff engaged in protected activity; (2) the defendant took action that would dissuade the average person from exercising his First Amendment rights; and (3) the defendant took the adverse action because of the plaintiff's protected speech. *Harnishfeger v. United States,* 943 F.3d 1105, 1112–13 (7th Cir. 2019). For the purpose of his motion for summary judgment, Selk does not dispute that being cut from the varsity team could dissuade both the average high school athlete and his father from exercising their free speech rights. Selk also does not dispute that Jake's statements during the October 2023 meeting are protected speech. So the court need not consider either issue.

Selk raises two issues in his summary judgment motion: (1) Mark's allegations of misconduct are not protected by the First Amendment because they were false and made with

reckless disregard for the truth; and (2) neither plaintiff can show that Selk cut Jake from the team because of their speech. The question on a motion for summary judgment is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

## A. Protected speech

The parties agree that Mark's speech was not protected if it was both false and made with reckless disregard for the truth. *See Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 796 (7th Cir. 2016). Selk contends that Mark's allegations about how Selk and MacKenzie ran the basketball camp meet this standard. Selk does not make the same contention in his opening brief about Mark's gambling allegations, so the court will not consider that issue. Selk did challenge the gambling allegations in his reply brief, but that was too late. *See Adams v. Bd. of Educ. of Harvey Sch. Dist. 152*, 968 F.3d 713, 716 (7th Cir. 2020).

Mark contends that the court may not grant summary judgment to Selk on the question whether his statements were false and made with reckless disregard for two reasons: (1) Selk is judicially estopped from making the argument; and (2) a reasonable jury could find that Mark made the statements in good faith.

### 1. Judicial estoppel

Judicial estoppel is a common-law doctrine intended to prevent a litigant from prevailing twice on opposite theories. *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). Neither the Supreme Court nor the Court of Appeals for the Seventh

11

Circuit have identified any brightline rules for applying the doctrine. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001); *Grochocinski*, 719 F.3d at 795. Instead, courts are to consider three factors: (1) whether the party's two positions are clearly inconsistent; (2) whether the party persuaded the court to adopt its earlier position; and (3) whether the party would obtain an unfair advantage or the opposing party would be unfairly prejudiced if the court accepted the new position. *New Hampshire*, 532 U.S. at 750–51. The doctrine most commonly involves opposing positions in different lawsuits, but it also applies to opposing positions at different stages of the same case. *Walton v. Bayer Corp.*, 643 F.3d 994, 1002–03 (7th Cir. 2011).

In this case, the Whalens contend that the court should reject Selk's argument that Mark's allegations of financial misconduct were false because Selk made an inconsistent argument when asking Magistrate Judge Boor to quash a subpoena that the Whalens served on the Waunakee Police Department. The Whalens sought documents that the police generated when investigating Mark's complaint about MacKenzie and Selk, but Selk objected on the ground that the investigation files were irrelevant to the case. Magistrate Judge Boor granted the motion to quash in part, limiting the subpoena to "investigative reports that contain or refer to statements made by defendants." Dkt. 24, at 1. The Whalens contend that they were prejudiced by this ruling because "the police could have gathered information unknown to Mark from other sources supporting the veracity of Mark Whalen's claim." Dkt. 56, at 12.

The court understands the Whalens to contend that the police files could have been relevant to showing that Mark's allegations were not false and thus protected by the First Amendment. But that is not the argument that the Whalens made in response to the motion to quash. Rather, they argued that the files were relevant to the parties' state of mind, specifically, "whether [Mark] knew his statements were false or in reckless disregard for the

truth" and whether "the defendants reasonably believed that Mark Whalen's speech was false." Dkt. 21, 3–5. Magistrate Judge Boor correctly rejected this argument, explaining that police files that no party viewed could not be relevant to showing what any party believed. Dkt. 24, at 5–6. The Whalens did not contend, so Magistrate Judge Boor did not consider, that the police files could show that Mark's allegations were true. This mismatch between the issues Magistrate Judge Boor considered and the argument the Whalens are making now prevents the Whalens from showing that Selk persuaded the court to adopt a position that is clearly inconsistent with the one Selk is asserting now.

The Whalens also fail to satisfy third factor—prejudice—because they identify no reason to believe that the police files would have been helpful to them. As an initial matter, no charges were ever filed against Selk, suggesting that the police did not find evidence of wrongdoing. It is true that there are many reasons why a prosecutor may decline to press charges. But the police department's investigation report, which the Whalens did obtain, suggests that there was nothing to investigate in the first place. The officer who wrote the report repeatedly stated that the allegations did not suggest criminal activity, even if they were true.[5]

The Whalens have not shown that judicial estoppel should apply, so the court will proceed to the merits.

### 2. False statements made with reckless disregard for the truth

Selk contends that "Mark's allegations that MacKenzie and Selk were engaged in fraud or financial misconduct were false statements made with reckless disregard of the truth."

---

[5] *See* Dkt. 46-2, at 2 ("[T]here appeared to possibly be some school policy violations by the coaches [but] I was failing to see a clear cut criminal act."); *id.* ("I reiterated that I was having a difficult time seeing a crime."); *id.* ("I didn't believe this was a fraud.").

Dkt. 42, at 7. A threshold problem with this contention is that Selk does not identify any specific false statements. Selk was not present when Mark made the statements at issue, and neither side describes any statement with particularity. Identifying the statements is important because statements must be both false and factual to be excluded from First Amendment protection. 3 *Smolla & Nimmer on Freedom of Speech* § 23:6 (2024 ed.). Interpretations of facts, theories, speculation, hyperbole and other statements that are not provably false generally remain protected. *See Madison v. Frazier*, 539 F.3d 646, 654 (7th Cir. 2008); *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1226–27 (7th Cir. 1993). In other words, "the First Amendment affords protection . . . to a speaker expressing an opinion that does not misstate actual facts." *Madison*, 539 F.3d at 653.[6]

At this stage of the proceedings, the court is required to draw all reasonable inferences in favor of the Whalens as the non-moving parties. *See Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020). Drawing such inferences, a jury could find that Mark's *factual* statements were true, and that Mark's statements that Selk had acted improperly or engaged in misconduct were his own conclusions or interpretations of those facts, so they are protected by the First Amendment.

Mark's factual allegations are largely undisputed: Selk's private business did use a school-affiliated nonprofit to promote his business and collect fees, Selk did use the school gym for his private business without paying the school district, and there were transfers from the

---

[6] Both sides cite First Amendment retaliation cases in the employment context, in which the employer is entitled to summary judgment on a retaliation claim if the employer "reasonably believed, based on an adequate investigation" that the employee's speech was false. *Swetlik v. Crawford*, 738 F.3d 818, 827–29 (7th Cir. 2013). Selk does not contend that this standard applies in this case, so the court does not consider that issue.

non-profit's bank account to the private business's bank account. What is disputed between the parties are the reasonable *inferences* to be drawn from those undisputed facts. Mark believed these facts were indicative of unethical, illegal, or even criminal conduct. Selk obviously disagrees, and both the school district and the police department sided with Selk. But that does not make Mark's statements false. He is entitled to express his belief that Selk acted improperly, even if that belief was misguided.

Seventh Circuit case law supports this conclusion. For example, in *Kristofek v. Vill. of Orland Hills*, the plaintiff was a police officer who was fired after going to the FBI with allegations that supervisors had committed misconduct by voiding citations that the plaintiff had issued for insurance violations. 832 F.3d 785, 797 (7th Cir. 2016). The court rejected the defendant's contention that the plaintiff's speech was false and therefore unprotected. The court acknowledged that "the FBI and U.S. Attorney's Office ultimately declined to take action after completing their investigation," but that was not dispositive because "the investigation report does not indicate that [the plaintiff's] *factual recitation* to FBI officials was flawed" or that "his suspicions were based on misinformation," *id.* (emphasis added), even if his ethical or legal conclusions were wrong.

In *Haynes*, a publisher was sued for a book that included statements that the plaintiff "left his children alone at night when he was supposed to be watching them; that he lost a job or jobs because of drinking; and that he spent money on a car that he should have used to buy shoes for his children." 8 F.3d at 1226. The court concluded that the statements were not false but instead were the author's "interpretation" of the plaintiff's financial circumstances, his "conjecture" about the effects of drinking too much, and his "speculat[ion]" about the plaintiff's motives. *Id.* at 1226–27.

15

These cases support a general rule that a speaker is entitled under the First Amendment to draw his own inferences and conclusions about facts, so long as it is clear from context that the speaker is offering his own opinion rather than a statement of fact. *See also Swetlik*, 738 F.3d at 827–29 (a speaker's "own reasonable interpretation of [another's] statements" are protected); *Madison*, 539 F.3d at 655 ("Frazier's speculations [are protected because they] fail to amount to verifiable assertions of fact, lacking precise and readily understood meaning."). As already noted, it is not clear from the parties' summary judgment submissions exactly what Mark's statements were or how clearly Mark communicated that he was expressing his opinions rather than stating facts.[7] But Mark's deposition, along with his emails, support a reasonable inference that he did not falsely state any verifiable facts. So Selk is not entitled to summary judgment on the question whether Mark statements were false and make with reckless disregard for the truth.

## B. Causation

Causation on a First Amendment retaliation claim proceeds in two steps. First, the plaintiff must show that his protected speech was "a motivating or substantial factor" for the defendant's adverse treatment of him. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429

---

[7] Selk cites *Balsewicz v. Blumer*, No. 17-cv-360, 2019 WL 1370105 (E.D. Wis. Mar. 26, 2019). for the proposition that the plaintiff has the burden to show that his statements were not false. But the court did not say that, and, in fact, decided the motion for summary judgment on the issue of causation, not whether the plaintiff's speech was protected. Some Seventh Circuit cases have suggested or assumed that the burden is on the defendant to show falsity. *See Kristofek*, 832 F.3d at 797 (stating that the defendant "failed to meet this high bar" of showing that the plaintiff's speech was false); *Gazarkiewicz v. Town of Kingsford Heights, Indiana*, 359 F.3d 933, 942 (7th Cir. 2004) (stating that the defendant did "not even attempt to prove" that plaintiff's speech was recklessly false). The court need not resolve this issue for the purpose of the summary judgment motion because a reasonable jury could find for Mark on this issue regardless of who has the burden. If this case proceeds to trial and this issue remains disputed, the parties should address the burden of proof in their motions in limine.

U.S. 274, 287(1977). A motivating or substantial factor simply means that the plaintiff's speech was at least one of the reasons for the defendant's conduct. Federal Civil Jury Instructions of the Seventh Circuit 6.01; *Johnson v. Kingston*, 292 F. Supp. 2d 1146, 1153 (W.D. Wis. 2003). Second, if the plaintiff meets his burden, the burden shifts to the defendant to show that he would have taken the same adverse action even without consideration of the plaintiff's protected speech. *Mt. Healthy*, 429 U.S. at 287.[8]

A reasonable jury could find that Mark and Jake's protected speech were reasons that Selk cut Jake from the varsity team and that Selk would have kept Jake on the team if Mark and Jake had not spoken out. As for Mark's speech, Selk admits that he knew that Mark was making accusations against him. And there is evidence that Selk was angry about those accusations and wanted to retaliate. For example, Mark testified that Selk talked about "getting rid of" or "weeding out" what he called "toxic parents" in the context of a meeting in which he expressed disagreement with the way MacKenzie had been treated. Several members of the varsity team similarly testified that Selk said during one of the first practices after cutting Jake

---

[8] Some cases refer to a third step, requiring the plaintiff to show that the defendant's explanation for his decision was pretextual. *See, e.g.*, *Deeren v. Anderson*, 72 F.4th 229, 235 (7th Cir. 2023); *Kingman v. Frederickson*, 40 F.4th 597, 601–02 (7th Cir. 2022). The test as articulated by the Supreme Court does not include that third step. *Mt. Healthy*, 429 U.S. at 287; *see also Smith v. Wilson*, 705 F.3d 674, 681 (7th Cir. 2013) ("[T]he Supreme Court has never abandoned the *Mt. Healthy* rule."). In any event, the third step is redundant: if the defendant shows that he would have taken the same action regardless of the plaintiff's speech, this necessarily means that the defendant's explanation is not pretextual. The court understands the court of appeals to be saying that courts may consider the defendant's stated reasons for his decision and any evidence of pretext when deciding whether a reasonable jury could find that the plaintiff's protected speech was a motivating or substantial factor in the defendant's decision or that the defendant would have made the same decision without regard to the plaintiff's speech.

that he had to "get rid of the toxins" for the good of the team. Selk later said about Mark, "[H]e thinks he can say absolutely whatever he wants and it won't be held against him."

Selk denies making the first two statements, and he says that the third statement had nothing to do with retaliating against Mark. But, again, the court must construe the facts in the Whalens' favor and accept their admissible evidence as true. "[W]hether ambiguous statements are discriminatory, retaliatory, or benign is an appropriate question for a jury." *Greengrass v. Int'l Monetary Sys. Ltd*., 776 F.3d 481, 486-87 (7th Cir. 2015). If the jury were to believe the testimony adduced by the Whalens, one reasonable inference is that Selk believed that Mark was a "toxin" whose unfair accusations got Selk's friend fired and were making Selk's life more difficult, so Selk wanted Jake off the team to punish Mark and teach him that he cannot say "whatever he wants." *See Castro v. DeVry Univ., Inc.,* 786 F.3d 559, 569 (7th Cir. 2015) (defendant's statements suggesting she was bothered by the plaintiff's speech was evidence of retaliatory intent); *Magyar v. Saint Joseph Regional Medical Center*, 544 F.3d 766, 773 (7th Cir. 2008) (same).

The suspicious statements alone are enough to create a genuine issue of material fact precluding summary judgment, but there are two other types of circumstantial evidence that Selk was treating Jake differently because of Mark's speech. First, there is evidence that Selk singled out Jake for adverse treatment without explanation. Jake says that Selk gave him the cold shoulder during the summer season after MacKenzie was terminated. And during varsity tryouts, Jake says that he was the only senior required to practice with the freshman. One reasonable explanation for this treatment is that Selk was angry with Jake for his father's speech. Selk denies treating Jake differently from anyone else, but, again, the court must accept Jake's version of events at the summary judgment stage.

Second, Selk and the other coaches admit that Jake was better than other players who made the team. Nineteen students made the varsity team, and the coaches ranked Selk's abilities as high as tenth. Only one other senior did not make the team, and that was because he did not show up for practice. Jake *did* make the varsity team his junior year, and Selk does not say that Jake's performance deteriorated between junior and senior year.

Selk's response to this is that his decision was not so much about Jake's basketball skills, but more about his attitude. Specifically, Selk says that Jake's perception of his skills was unrealistic, and Selk believed that Jake would not be happy with anything less than a spot on the rotation.

A reasonable jury would not have to credit Selk's explanation, for two reasons. First, as already discussed, Mark has adduced evidence that Selk was motivated by Mark's speech when deciding whether to cut Jake from the team. Determining which reason was decisive requires weighing the evidence, something that is reserved for the factfinder. *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007).

Second, in arguing that it was reasonable to believe that Jake would not accept an auxiliary role on the team, Selk relies primarily on one statement that that Jake made during a meeting with the principal. But Jake denies making that statement, so the court cannot consider it for the purpose of deciding Selk's summary judgment motion. In any event, the statement was that Jake believed he was good enough to be part of the rotation, and a reasonable jury could find that such a statement would not have influenced Selk, for multiple reasons:

- Selk and the other coaches admitted that it was common for students to want more playing time, and they would not hold it against a student for expressing

dissatisfaction with his place on the team. Dkt. 92, ¶¶ 134–36, 158–63, 165–66, 171.

- Selk and the other coaches admitted that Jake was a good teammate who did not complain to his teammates. *Id.*, ¶¶ 164, 183. Despite Jake losing playing time during his junior year, Selk does not allege that Jake displayed a poor attitude with other players or had an adverse effect on team morale.

- Selk and the coaches asked at least three other players whether they could accept being on the team if they were not in the rotation. No one had that conversation with Jake. *Id.*, ¶¶ 173–74.

- When Selk explained to Jake why he had not been selected for the varsity team, Selk stated his concern that Jake would not be an "all in" player. That was the same type of language Mark says that Selk used during the meeting in which he talked about getting rid of "toxic parents."

One reasonable inference from this evidence is that Selk was less concerned than he claims that Jake's attitude would prevent him from being a productive member of the team, and that the concern was more of a smokescreen for Selk's desire to get back at Mark than a genuine belief. *See Rauland–Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006) ("[I]f the stated reason, even if actually present to the mind of the [defendant], wasn't what induced him to take the challenged . . . action, it was a pretext.").

Selk says that he also considered Jake's decision to leave the summer tournament without talking to the coaches. But a reasonable jury could discredit that statement too, again for multiple reasons: (1) Selk did not identify that as a reason for cutting Jake at the time Selk made the decision; (2) Selk knew that Mark got into an argument with MacKenzie during the

tournament, which could have explained why Mark and Jake left; and (3) Selk never told Jake that it bothered him that he left the tournament, and Selk did not otherwise talk to Jake or Mark about why they left. Again, one reasonable inference from this evidence is that Selk did not rely on this concern when making the decision to cut Jake. *See Bagwe v. Sedgwick Claims Mgmt. Servs.,* Inc., 811 F.3d 866, 882 (7th Cir. 2016) (after-the-fact justification supports finding of pretext); *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 692–93 (7th Cir. 2007) (failure to tell plaintiff about a problem supports a finding of pretext).

The bottom line is that the evidence is disputed regarding why Selk cut Jake from the varsity team, and there are reasonable inferences supporting a finding that Selk was motivated by Mark's speech more than concerns about Jake's attitude.

A reasonable jury could also find that Selk was motivated in part by Jake's speech. To be sure, there is stronger evidence that Selk was trying to retaliate against Mark than Jake. The only speech by Jake that is at issue are his statements in October 2023 during the meeting with Selk and the principal about wanting to be treated fairly. But as the court noted in the order denying the motion to dismiss, "[a] single event can have multiple but-for causes." *Malin v. Hospira, Inc.*, 762 F.3d 552, 562 (7th Cir. 2014). Selk admits that Jake's speech during the meeting was "a factor" in Selk's decision to cut Jake from the team. Dkt. 85 (Selk Dep. 36:20–21). And Jake and Mark's speech is intertwined. So it will be up to the jury to decide what speech, if any, influenced Selk's decision.

There are genuine issues of material fact precluding summary judgment on each of the issues that Selk raises in his motion. In the absence of a settlement, those disputes will have to be resolved by the jury.

21

ORDER

IT IS ORDERED that:

1. Tyler Selk's motion for summary judgment, Dkt. 41, is DENIED.

2. Before submitting their pretrial submissions, the parties should carefully review this court's trial procedures for jury trials, which are attached to the preliminary pretrial conference order. Dkt. 15.

Entered August 14, 2025.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge